It's Guurca v. Bon Secours Charity Health System, that is 23-200. We've got Mr. Sussman, and you have reserved two minutes. Is that correct, sir? Yes, Your Honor. I'll let your counsel get ready. Okay. You guys may proceed. Thank you. Thank you. May it please the Court. This matter comes—I'm Michael Sussman. I represent Dr. Jurca. Okay. I am having a hard time hearing you. I am Michael Sussman. I represent Dr. Jurca. Is that better? Yes. And you're welcome to lift it if you need to get there closer. This case comes before the Court on an appeal from two rulings of the District Court. The first ruling respects a motion to dismiss a Title VII employment discrimination claim based on religion. The second is a summary judgment decision regarding retaliation. The facts are extensively set forth, and I'm not going to reiterate them except as to say as follows. With regard to the first matter, the motion to dismiss, the complaint sufficiently pleads that Dr. Jurca, who is Romanian Orthodox Christian, has religious beliefs which prevent him from adhering to or professing adherence to the Catholic mission. So I want to ask, though. Yes. I have a couple questions related to that. Sure. No one, I think, disputed what his religious beliefs are. The question is, did you put in enough to suggest that there's an actual conflict between the ERDs? Yes. I think we did put in enough. So tell me what is enough and where you think argues an actual conflict. The actual conflict is that the client, Dr. Jurca, has, and I believe this is in the complaint, has strongly held beliefs that the Catholic Church committed atrocities against his religious order, that he cannot profess in that context, out of his religious beliefs, any adherence to the Catholic Church or, quote, its mission. Okay. Go ahead. Sorry. Can you just point us to where that is in the complaint? Because I have the same question. Okay. As opposed to in the briefing where it's everywhere. Everywhere, yes. But in the document itself, in the operative complaint, can you help us find where those allegations fall? Okay. I don't honestly have the complaint in front of me, I'm sorry to say. I should. My understanding, and I didn't write the complaint. I came into this case late. My understanding is that Dr. Jurca, from the outset in the complaint, made clear that he had gone to the institution, asked the institution for employment, was faced with the ERDs, responded to the institution that the ERDs were against his, in essence, this is a conversation with Jurca. Okay. So we right now don't have at least affirmative indication from you that there was. Where that is. And the complaint that there was an actual. Where do you think is your best evidence suggesting that the defendants were on notice of an actual complaint? There's quite a number of places where he asked questions. But, like, where is somebody saying that there is a conflict? Okay. There are two answers to that question, Your Honor. One is that there is a EEOC charge filed in June of 2019. I'm sorry. There's a what what? There's an EEOC charge in June of 2019 which predicates the retaliation claim. The EEOC charge explicates exactly what the Court is asking. He says in the charge that he's been denied employment because of his refusal to sign the ERDs. Right. But prior to. Go ahead, please. The charge against whom? The charge against the defendants, Your Honor. All of them. The EEOC charge. The hospital system. Yes, Your Honor. And it's your. I wasn't clear from the complaint or from the brief that there was any allegations that the decision-makers were even aware of the EEOC. The decision-makers in this case appear to be in HR and the general counsel's office of the hospital, and they had given the direction in August 2019 to reject Dr. Jerka's application when there were extant and open positions. Those individuals acknowledge in their deposition that they knew both of his prior resistance to signing the ERDs, which were first communicated in 2017 to Mr. Korka and then repeated over and again in 2018 and 19. But more importantly, from my point of view, they were aware of the EEOC charge, which explicates, as I said a moment ago, his opposition and their response to his opposition. As he alleged it. Would you concede that lying about an employment history would have been sufficient grounds by itself? Well, I might concede it, but Mr. Rabinowitz, who was the person who directed the letter, said in his deposition that he did not believe that would be sufficient and he believed you'd have to look further. So the other part to remember is that the individual who rejected him on March 8th, as we put in the brief, did not know as of March 8th, taking the facts most favorably to us, anything about the lying. So that couldn't have animated the decision on March 8th. What she knew about was the ERD opposition. She knew about the ERD opposition because she had a conversation the prior November with Mr. Korka, who explained to him the ERD opposition, and he, Korka, had then applications pending for vacant positions, which he was not being given. So the evidence, as I see it most favorably to him, is overwhelming, frankly, on a motion for summary judgment that the animating reason as of March of 2019, and then again as of August of 2019, was not his lying but rather his ERD issue. Well, he also had a less than ideal work history, being fired and engaging in lawsuits against employers. Well, it's, first of all, just to be clear, he really hadn't been fired. He did resign two positions. That's true. His EEO matter, excuse me, his termination is therefore, in my view, a red herring. The issue that he filed the lawsuit is true, but that's to say that an employer can say you filed a lawsuit and we're not going to hire you for filing a lawsuit. Well, but that's not the question that we have as a but-for cause. So if there are other grounds like the lying about employment history in Angela V. based on experience of certification, the other lawsuit, the sketchy employment history, how are you able to identify for us that the opposition to the ERDs was a but-for cause? Well, I think, frankly, respectfully, this is a motion for summary judgment. And I think what the court is doing is something alike to what Judge Seibel did, which is really engaging in fact-finding. A jury could repudiate entirely that any of that was causally related to what happened. And that's the fundamental issue here. Do you believe under Reeves or can you believe under Reeves the explanations given by a defendant? And the scallop clearly in this circuit suggests that you cannot do that. Matters of intent are involved. For instance, let me give you an example. Dr. Bartels told me in deposition that he thought that Dr. Gerke was essentially slimy. That was his word that he used. Yet that's the same doctor who, after the initial interview where he made that conclusion, himself calls Dr. Gerke and tells him of an open position at Good Samaritan and asks him to apply. I noticed that. But how does that not actually undercut your case? Because that was the person who was the one that you maintain is most aware of any objections. No, he's not the most aware, respectfully. The people who are most aware were the people in HR and the legal department who directed by their own statement the rejection of our client. It was not Dr. Bartels who did that. Those who did that were Mr. Rabinowitz and Ms. Zolkowicz, who was in the legal department. They're the ones who were dealing with the EEOC matter. They're the ones who knew by their own profession his ERD opposition. Bartels was not in that position. Can I ask another question before you run out of time? Yes, of course. Where is the case that says that being required as an employer to follow certain things in the context of your employment infringes? In other words, no one is telling your client you cannot have your beliefs, but they're saying when you are in this position, this is what our employer wants outward facing. Just to clarify, you're asking is there a case which says that an employer may not impose an ERD or EAD-like conditions on employees? That's what you're really asking. Right, that it becomes a free exercise problem or a discrimination problem to say that having a position or a viewpoint as an employer just by having it infringes on somebody's exercise rights. I think the question, respectfully, is settled by cases like Cain in this circuit, which arose during the vaccination crisis, where the issue was, as the issue is here, the employee needs or comes to you and says, I can't comply with whatever it is, whether it's a religious prescription or something else. The employee is asserting his religion as a bar to whatever you are requiring him to do. Isn't that what he asserted? As opposed to he just sort of, he was, he found the Catholic church's practices as he believed them to be problematic or offensive or something. As opposed to, did he articulate to these folks, the ERDs conflict with my personal religious beliefs? As opposed to, geez, is it true that I would have to sign these? You know, it feels kind of weird that I would have to sign these. I heard I might have to sign these. Can I just finish answering that question and then I'll try to jump over? So I think that the standard that was set in the Cain case and other cases since, and there were two cases in the last two months decided by the circuit reiterating the same point, is that an employee who is saying they are burdened, their religious expression, belief, and belief comes into play here as well to answer your question, Your Honor, is burdened. That turns the burden to the employer to explain why they cannot reasonably accommodate that. The reasonable accommodation here could very well have been, you don't have to sign on to the ERD, because the ERD has all the stuff if you look at Directives 1 and 9, which are clearly professions of agreement with the mission of the Catholic church, which my client couldn't agree to for reasons which do have to do with his religiosity and his belief set, which is contrary to the Catholic church's dogma. But in any event, there is an accommodation then possible. And all of our cases say that that accommodation has to be considered unless there's an undue burden. There is no undue burden here. Thank you. You've got some time on your button. Thank you. May it please the Court, my name is Michael Keene. I represent the Hospital of Pelley's. I want to start with a conversation that just occurred a few moments ago about Dr. Bartel reaching out on his own to Dr. Gierka. That's just not so. In the record at 626 to 631, there's a transcript of the discussion. Dr. Gierka secretly tapes all his discussions at the hospital. And in that discussion, Dr. Gierka asked for some information about how the job and also asked to find out more about bond supports. And Dr. Bartel said absolutely he would get the information for him. That was the cause of the call. I'd like to start with a but-for causation issue in this appeal. The standard applied here is but-for the alleged protected activity, would he have been hired? And the answer to that is an emphatic no. When we look at Dr. Gierka's CV in the record at 634, we find that he graduated from medical school in Romania in 2000, obtained a New York medical license in 2012, and had only two full-time attending hospital jobs. So the argument that your colleague on the other side is making is that that is the province of the jury. So why is that wrong? You need evidence. The judge looked at that and addressed that question. What kind of evidence is sufficient in this case? Evidence that somebody with the work history that this particular plaintiff and appellant had could be credentialed. So you're saying that we need to issue an opinion demanding a comparator? No, I think that this is a post-discovery summary judgment motion. The time for that has come and gone. Mr. Sussman is, I think, the third or fourth lawyer on this case. Somebody could have challenged that, which has been known from the outset. We put in the affidavit of Angeles Greta, who, and she was deposed in this case, who runs credentialing. And we found out, what came out is, in his two jobs at Montefiore and Orange Regional, they were toxic. He ended up suing both. Montefiore accused him of multiple failings in performance, professionalism, and communication. Montefiore put him on probation. He was told his prior employment by his prior employers was unsustainable. Appellant claimed Montefiore blacklisted him, caused him to suffer high blood pressure, made him fear he would die of a stroke. Orange Regional accused him of inappropriately using residents for research. Throughout those two employment experiences, he was known to report his colleagues to supervisors. He was known to secretly report his colleagues to state regulators. Okay, so I think we've got, we understand your position on this. Do you have any case that says that rules similar to those imposed by the ERDs do not conflict with a religious belief? Are they something different? Is there some sort of distinction between requiring a person to have these views or only hiring someone versus adopting that as the employer? Well, I have four responses. If you see in the Mercy Medical case from the Ninth Circuit that's cited in our brief, in that case a physician was challenging the directive that prohibited sterilization services. And the court said, you're free to believe those services are fine, but the hospital is free to say you can't perform those services either. Let me ask another question. Is there any precedential case that would suggest that a rule like an ERD does not conflict, or like the ERDs in issue does not conflict with that? I have two responses to that. This is not an anecdotal case. These directives are in every Catholic hospital in the United States. And, no, I have not found a case other than the Mercy Medical case that directly addressed that issue. But I also have to mention the ERDs are not relevant here. And here's why I say that. He didn't read the ERDs. There are 72 directives. Prior to this lawsuit, he never read the directives. So by definition, he cannot object to the directives, and he cannot protest the directives. I want to be sure I fully understand your response. You said prior to this lawsuit, he didn't read them. Is that what the record shows? Yes, it is. If you look at the record of 759, 764, and 765, this whole case came from Dr. Gierka being presented a contract by Good Samaritan. That's on the religious side of the network. Westchester County Medical Center is not a Catholic institution. In the contract, they say he must abide by the ERDs promulgated by the church. That's all he knows about. He never read them. He asked for them. He never obtained them. They're on the website. So when you look at the record, and Judge Seibel did, when he asked about the ERDs, since he never read them before filing the lawsuit, he asked, well, does it mean if a priest rapes a child, we would have to cover that up? That's one of his thoughts about what they meant. Another one was that he would have to adopt the Catholic religion. That's at 466 and 213. Another one was that he could not practice his own Romanian Orthodox Christian religion. All of that is wrong and implausible. He never read the directive. He never objected to any one of the 72 directives. If he were asked when he filed his EEOC. So I understand you'd be making a little bit different arguments. I thought you were going to use those facts, or at least I read your briefing, to suggest that those kinds of inquiries didn't put people on notice as to any allegations of religious discrimination or any allegations of conflict. You just said something a little stronger. You said that he had never actually read them. That's correct. Okay, and the best evidence you have for that is the question asking, the questions that he asked that you did put in the briefing about the conversations with Corka and the conversations with Bellinger and the conversations of those lines. Is there somewhere you got an admission that said, no, I never read them? The 759, 764, 765, what we see as well into this dispute, Dr. Gierke is asking. So we're supposed to infer from those questions that he didn't read them. Well, but 765 is the complaint in which Dr. Gierke alleges they wouldn't give me the ERDs, right? Right. Okay, so is that how we know he never had the ERDs? Is it that simple? I mean, you're answering a lot of stuff here, but the complaint says I never got them. Right. Okay. Okay. And we also have e-mails from him to the recruiter at Good Sam, which I think is 759 or 764, 759, where he's asking for copies of them, and he's well down his road of saying, this is strange that you have a requirement in a contract that I follow ERDs. Okay. So as I understand, so as I am. Your position is that he wouldn't be asking for copies if he had copies. Yes, Your Honor. And also, what's the protected activity here? Judge Seibel, you know, fortunately, in hindsight fortunately, Dr. Gierke tape recorded secretly all those calls. Judge Seibel read those transcripts, and she said there's no protected activity. He never protests. He never objects to the ERDs. He just asks questions about them. She listened to the discussions. So what is the protected activity? A line in a contract that said you must follow these rules. So the argument we just heard about the ERDs and whether their origin in history reflects religious influence, it's an academic exercise. He never read that. There's no objection to the rules of conduct in those 72 directives. And there's also a credibility issue, too, which I think was appropriate. He's saying now in the litigation he would follow the rules. He would sign the rules now that he's read them in the context of the litigation. But he wants the statement that they were promulgated by the Catholic Church to be removed. But he does understand he's going to work in a Catholic hospital. He's going to a hospital that was founded by the Sisters of Bon Secours, the Sisters of Charity. But he doesn't want this one statement. It just doesn't make any sense. The bottom line is those rules are rules of conduct. There is nothing in them that prevents him from practicing his Romanian Orthodox Christian religion. There is nothing in them that forces him to practice Catholicism. There is nothing in those rules that will change the way he practices medicine. He could have signed on to those rules of conduct. Okay, but I just want to make sure. So the argument that you are making is that there's no ‑‑ the court didn't err on the religious discrimination and failure to accommodate cases because there was no conflict. And then you're arguing that there was no protected activity because he didn't actually know them enough to object. Is that right? That is correct. Because the conversation is getting very interwoven. There are two independent ways to look at it. And I will also say, since you mentioned it before, the decision makers did not know it. Dr. Bartel was a decision maker. He didn't even know about Dr. Gierker's history or problems at Good Sam on the Catholic side of the health system until he was called for a deposition. And that's in his affidavit in support of sermon judgment. I see my time is up. Thank you. Unless there are other questions, thank you. Okay. Mr. Sussman, you've got two minutes. 638, 636 through 638 is where Dr. Bartel offers my client a position or suggests a position for him to apply for after the conversation, which counsel is talking about. So I'm directing the court to that. That's where he started. Dr. Ophel, AFFUL, is the comparator. He had not graduated. His residency program had no certifications whatsoever. Went hard in February 2019 when my client had applied and my client was fully qualified for the position. He was set aside at that time because it had been made clear by Corker to the individual who was then running selection, Calavita, that he objected to the ERDs. That's in the record. It's clear. With regard to counsel's point, there are two different timelines here, just so the Court is clear. One timeline goes up through March, and that relates to the religious discrimination claim that was dismissed on the motion to dismiss. The second timeline starts in June, goes through August. That relates to the summary judgment motion. If you divide this that way, you'll better understand the facts. The facts are that Bartel, after offering my client this, suggested to my client this position, the matter went up higher in the hierarchy. At that point, it's indisputed in this record that the decision was made by Rabinowitz and Kolkowitz, who was the lawyer, to direct the letter to be written by Ruggiero, who wrote the letter, telling my client on August 20th that they didn't want him. That's what happened. Nobody knew of it at the time. That's the simple answer to your question. What the Court is doing is taking a look at what they found out later, which did not We knew this. We didn't know this. Nobody knew what the Court is referring to. I hear what you're saying, Judge Parker, but people didn't know it. That's not the basis for their decision. The basis for their decision was he refused to sign on to the ERDs, which he did, explicitly, and they all knew that, and they made an issue of that internally. And he filed the complaint. I didn't hear counsel mention the EEOC charge filed in June. He says there's no opposition. Clearly, retaliation is triggered by temporally. He files the complaint in June. He sends it to the legal department, the people in the legal department, and the people making the decision two months later. It's basic case law in this circuit in terms of how you understand retaliation. It presents fact issues. Thank you so much. Thank you. I appreciate it. We will take this case under advisement.